[No. C050294. Third Dist. Aug. 10, 2009.]

KEVAN HARRY GILMAN, Plaintiff and Appellant, v.
LENA L. DALBY et al., Defendants and Respondents.

608

## COUNSEL

John Schlanger for Plaintiff and Appellant.

Dreyer, Babich, Buccola & Callaham, Steven M. Campora and Carolyn L. Katzorke for Defendants and Respondents.

## OPINION

**SCOTLAND, P. J.**—The nature of medical liens and attorney liens, and their priority with respect to a monetary recovery obtained in a lawsuit by an injured plaintiff against a tortfeasor, are subjects that consume much of a personal injury plaintiff lawyer's time; and they have been the subjects of numerous appellate decisions. (See, e.g., *Fletcher v. Davis* (2004) 33 Cal.4th 61 [14 Cal.Rptr.3d 58, 90 P.3d 1216]; *Cetenko v. United California Bank* (1982) 30 Cal.3d 528 [179 Cal.Rptr. 902, 638 P.2d 1299]; *Waltrip v. Kimberlin* (2008) 164 Cal.App.4th 517 [79 Cal.Rptr.3d 460]; *Pangborn Plumbing Corp. v. Carruthers & Skiffington* (2002) 97 Cal.App.4th 1039 [119 Cal.Rptr.2d 416]; *Wujcik v. Wujcik* (1994) 21 Cal.App.4th 1790 [27 Cal.Rptr.2d 102]; *Nicoletti v. Lizzoli* (1981) 124 Cal.App.3d 361 [177 Cal.Rptr. 685]; see also *Carroll v. Interstate Brands Corp.* (2002) 99 Cal.App.4th 1168 [121 Cal.Rptr.2d 532].)

However, the parties in this proceeding have not pointed to, and we have not found, any decision that has directly decided which of a contractual medical lien and an attorney lien for fees and costs of litigation has priority over the other. We address the question now, without repeating all that has already been said about medical liens and attorney liens.

Plaintiff, Kevan Harry Gilman, is in the business of paying, at a discount, the cost of medical services provided to an injured person, and obtaining from the medical provider and the injured person an assignment of the

medical lien for the full amount, to be collected from a judgment that might be obtained by the person in a lawsuit against the tortfeasor who caused the injury. The medical provider agrees to the arrangement to ensure that it immediately receives some compensation for the services it provides to a person who lacks the resources to pay for them. The patient agrees to the arrangement in order to obtain the services that otherwise might not be provided. And Gilman agrees to the arrangement in hopes of getting more money via the medical lien than he paid for the lien.

Defendants, Lena L. Dalby, Roger Dreyer, Joseph Babich, Robert Buccola, William Callaham, and the law firm of Dreyer, Babich, Buccola & Callaham, were retained by an injured person who had entered into such an arrangement with Gilman while the person was represented by another attorney.

Things did not come out as Gilman, defendants, and the injured person hoped. The lawsuit was settled for slightly less than what was spent in litigation costs, and defendants waived their right to attorney fees under their contingency fee agreement, "due to the fact that the settlement amount was less than the total of office costs that had been incurred."

Claiming he is entitled to payment on his lien from the amount of the settlement, Gilman sued defendants for, among other things, breach of fiduciary duty and conversion. Defendants' answer asserted, among other things, that Gilman's complaint failed to state facts sufficient to constitute causes of action and that "there were other liens superior and prior to [Gilman's] lien"; thus, defendants "were legally bound to pay said superior and prior liens, before any payment could be made to [Gilman]."

Gilman appeals from the judgment entered in favor of defendants after the trial court sustained their demurrer to the cause of action for breach of fiduciary duty and granted their motion for summary judgment on the other causes of action. He contests only the rulings on his claims of breach of fiduciary duty and conversion, as well as the order granting defendants' request for attorney fees and costs.

■ As we shall explain, Gilman was not defendants' client and, because defendants had not signed the lien, they did not have any contractual duty to him. His complaint is devoid of any allegations showing a traditionally recognized fiduciary relationship. The fact that defendants were "aware of" Gilman's lien is not enough to create a fiduciary duty. Thus, the trial court correctly sustained, without leave to amend, the demurrer to the breach of fiduciary duty cause of action. As to the claim of conversion, we conclude that, as a matter of equity and public policy, defendants' purported attorney lien for costs had priority over Gilman's medical lien, regardless of which

came first in time. Because the purported attorney lien for costs exceeded the amount of the settlement, there was nothing left for Gilman to collect via his lien, and thus there was no basis for a claim of conversion. However, in the summary judgment proceeding, defendants did not submit any evidence that they had an attorney lien against the recovery, thus failing to establish that they were entitled to deduct their litigation costs from the settlement proceeds. Consequently, we will reverse the summary judgment entered in defendants' favor on the conversion cause of action and remand the matter for further proceedings on that claim. It follows that we must reverse the award of attorney fees and costs predicated upon defendants being the prevailing parties.

## FACTS

Gilman is in the practice of "factoring medical accounts" and operates under the fictitious business name of Lien Medical. He pays, at a discount, the medical bills of injured persons who are pursuing litigation to recover damages for their injuries, and then obtains an assignment of the medical providers' accounts receivable. He also obtains contractual liens from the injured persons and their counsel, which give Gilman liens against any recoveries obtained in the lawsuits.

In April 2001, James DaPrato was in an automobile accident. Sacramento MRI Center provided medical services to DaPrato on May 4, 2001, and then sold and assigned to Lien Medical all of the center's right, title, and interest in DaPrato's account. On the same day, DaPrato signed a contractual lien, which gave Lien Medical a lien against any recovery that DaPrato might receive in litigation to recover damages for his injuries. The lien states: "With respect to any and all monies received as a result of this INCIDENT, you are not to disburse any such monies prior to paying LIEN MEDICAL in full for the lien that LIEN MEDICAL holds as a result of this INCIDENT. YOU must pay LIEN MEDICAL in full within 30 days of receipt of any monies received as a result of this INCIDENT." DaPrato agreed that he remained personally liable for the money owed to Lien Medical.

DaPrato's attorney, Paige Hibbert, also signed the lien and agreed to notify Lien Medical of any substitution of attorney and to provide the successor attorney with a copy of the lien.

In July 2001, DaPrato changed attorneys, retaining Dalby, an attorney with defendants' law firm. According to Gilman, Dalby was aware of the lien, but Dalby and the other defendants did not sign the lien.

DaPrato settled his lawsuit in June 2003 for $6,500, which was less than the litigation costs of $6,882.47, including filing fees; the cost of process

service, deposition fees, and deposition transcripts; expenses for records and postage; and other costs of professional services. Defendant Dalby submitted a declaration stating defendants should have received 30 percent of the $6,500 award, i.e., $1,950, but waived their fees because the amount of the settlement was less than the amount of litigation costs. Thus, other than covering most of their costs, defendants did not receive any money from the settlement; nor did DaPrato and Gilman. According to Dalby, "[t]here were no settlement proceeds subject to any lien."

Gilman sued Dalby, her law firm, and the individual members of the firm for breach of contract, account stated, open book account, conversion, unjust enrichment, breach of fiduciary duty, and an accounting.

Defendants demurred to the entire complaint. The trial court sustained the demurrer as to the causes of action for breach of fiduciary duty and unjust enrichment.

Defendants then moved for summary judgment on the remaining causes of action. Gilman opposed the motion, but only as to the cause of action for conversion. Defendants alleged that Gilman could not pursue an action for conversion because he did not have an ownership interest in the settlement proceeds at the time of the alleged conversion and, in any event, there were no settlement proceeds for defendants to convert because the litigation costs exceeded the settlement amount. The court granted the motion and entered judgment for defendants.

On appeal, Gilman challenges only the rulings on the causes of action for breach of fiduciary duty and conversion.

## DISCUSSION

### I

Gilman contends the trial court erred in concluding there is no factual or legal basis for his claim of breach of fiduciary duty, and in thus sustaining, without leave to amend, defendants' demurrer to that cause of action.

On appeal from a judgment of dismissal following the sustaining of a demurrer without leave to amend, we examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415 [106 Cal.Rptr.2d 271, 21 P.3d 1189].) We give the complaint a reasonable interpretation and treat the demurrer as admitting all material facts properly pleaded; however, we do not assume the truth of contentions,

deductions, or conclusions of law. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) We may take notice of exhibits attached to the complaint; the facts in the exhibits take precedence if they contradict facts alleged in the complaint. (*Mead v. Sanwa Bank California* (1998) 61 Cal.App.4th 561, 567–568 [71 Cal.Rptr.2d 625].)

If the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment, then it is an abuse of discretion to sustain a demurrer without leave to amend. (*Aubry v. Tri-City Hospital Dist., supra*, 2 Cal.4th at p. 967.) The burden of proving that such a reasonable possibility exists is squarely on the plaintiff, who must demonstrate that he could amend the complaint and how the amendment would change the legal effect of his pleading. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349–350 [134 Cal.Rptr. 375, 556 P.2d 737].)

■ Gilman's complaint alleges that DaPrato retained defendants to represent DaPrato in a personal injury lawsuit, and that DaPrato received medical care for his injuries, the payment for which was secured by a written lien owned by Gilman. According to the complaint, defendants either signed the lien or had knowledge of its existence. However, the copy of the lien attached to the complaint shows that defendants did not sign the lien and were not parties to the lien contract. The facts in the lien document take precedence over the allegations of the complaint. (*Mead v. Sanwa Bank California, supra*, 61 Cal.App.4th at pp. 567–568.)

The complaint further alleges that defendants received funds applicable to Gilman's lien and that, upon receipt of those funds, they "owed [him] a fiduciary duty and obligation not to act in any manner that would compromise [his] claim of lien." According to the complaint, defendants had knowledge of the lien and knew that there was a dispute regarding entitlement to the funds, yet disbursed the monies rather than interpleading the funds to determine who had the superior right to them. Therefore, the complaint alleges, defendants failed to exercise reasonable care, causing detriment to Gilman in the amount of his lien for $1,250.

As we will explain, the allegations are insufficient to state a cause of action for breach of fiduciary duty.

■ A fiduciary relationship is " 'any relation existing between parties to a transaction wherein one of the parties is . . . duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he

voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent. A fiduciary relation in law is ordinarily synonymous with a confidential relation.' " (*Herbert v. Lankershim* (1937) 9 Cal.2d 409, 483 [71 P.2d 220]; see *Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 29 [130 Cal.Rptr.2d 860] (hereafter *Wolf*).)

■ In the commercial context, traditional examples of fiduciary relationships include those of trustee/beneficiary, corporate directors and majority shareholders, business partners, joint adventurers, and agent/principal. (*Wolf, supra*, 107 Cal.App.4th at p. 30.) "Inherent in each of these relationships is the duty of undivided loyalty the fiduciary owes to its beneficiary, imposing on the fiduciary obligations far more stringent than those required of ordinary contractors." (*Ibid.*) Absent such a relationship, a plaintiff cannot turn an ordinary breach of contract into a breach of fiduciary duty based solely on the breach of the implied covenant of good faith and fair dealing contained in every contract. (*Id.* at p. 31.) " 'Being of universal prevalence, [the implied covenant] cannot create a fiduciary relationship; it affords basis for redress for breach of contract and that is all.' [Citation.]" (*Ibid.*)

■ In this case, the lien created nothing more than a contractual duty to withhold money for Gilman in the event the litigation was successful. "[T]he contractual right to contingent compensation in the control of another has never, by itself, been sufficient to create a fiduciary relationship where one would not otherwise exist." (*Wolf, supra*, 107 Cal.App.4th at pp. 30–31, citing *Downey v. Humphreys* (1951) 102 Cal.App.2d 323, 332 [227 P.2d 484] [the obligation to pay money is a "debt," which "is not a trust" and does not create a fiduciary relationship, "whether [debtor's] liability is certain or contingent"]; *Wiltsee v. California Emp. Com.* (1945) 69 Cal.App.2d 120, 125, 128 [158 P.2d 612] [employment contract entitling employee to 25 percent of future profits did not create a joint venture or give rise to a fiduciary relationship]; *New v. New* (1957) 148 Cal.App.2d 372, 381–382 [306 P.2d 987] [a contractual obligation to pay former spouse a percentage of future monies received from stock holdings, if any, was no different from an obligation to pay fixed monthly sum; although an implied duty of good faith and fair dealing existed in the contract, the contingent nature of the debt and the debtor's exclusive control of monies received did not create a fiduciary relationship].)

Gilman was not defendants' client, and because defendants had not signed the lien, they did not have any contractual duty to him. His complaint is devoid of any allegations showing an agency, trust, joint venture, partnership, or other traditionally recognized fiduciary relationship. The complaint merely alleges defendants owed him a fiduciary duty because they were "aware of" his lien. However, such awareness is not enough to create a fiduciary duty.

Gilman disagrees, relying on *Crooks v. State Bar* (1970) 3 Cal.3d 346 [90 Cal.Rptr. 600, 475 P.2d 872] (hereafter *Crooks*) and *Johnstone v. State Bar* (1966) 64 Cal.2d 153 [49 Cal.Rptr. 97, 410 P.2d 617] (hereafter *Johnstone*). His reliance on those cases concerning attorney disciplinary matters is misplaced.

In *Crooks*, an attorney who had agreed to be an escrow holder was disciplined by the State Bar of California due to the attorney's knowing disregard of his responsibilities as a fiduciary in handling escrow funds in a manner that violated explicit escrow instructions. (*Crooks, supra*, 3 Cal.3d at pp. 348–349, 356.) *Johnstone* involved an attorney who represented an injured worker and agreed with the workers' compensation insurer to hold and disburse settlement funds in exchange for the insurer's agreement to accept less money, but later reneged on the agreement. The attorney was disciplined for breaching his fiduciary duty after agreeing to act as a trustee. (*Johnstone, supra*, 64 Cal.2d at pp. 155–156.)

Here, defendants did not have any agreement with Gilman to act as his fiduciary. As shown by the copy of the lien attached to the complaint, defendants did not sign the lien. Defendants' mere awareness of the lien, as alleged by Gilman, is not the equivalent of their agreeing to act as trustees for Gilman; and it does not make them escrow agents with respect to the litigation proceeds.

Because the allegations of the complaint do not establish that defendants had a fiduciary duty to Gilman, the trial court correctly sustained, without leave to amend, the demurrer to Gilman's cause of action for breach of fiduciary duty.

## II

Gilman next asserts that the trial court erred in granting defendants' motion for summary judgment on the conversion cause of action, ruling that (1) Gilman did not have a sufficient interest in the settlement proceeds to support an action for conversion, and (2) the settlement proceeds were all expended on litigation costs so there was no property for defendants to convert.[1]

We agree with Gilman that the first ground upon which the trial court relied is flawed.

---

[1] Conversion is the wrongful exercise of dominion over another's property. The plaintiff must establish (1) ownership of, or a right to possess, the property at the time of the conversion, and (2) the defendant's conversion "by a wrongful act or disposition of [the plaintiff's] property rights." (*Oakdale Village Group v. Fong* (1996) 43 Cal.App.4th 539, 543–544 [50 Cal.Rptr.2d 810].) Because conversion is a strict liability tort, questions of the defendant's good faith, lack of knowledge, motive, or intent are not relevant. (*Id.* at p. 544.)

Gilman, the assignee of a health care provider's medical account, possesses a lien for payment of services rendered in connection with the injury that gave rise to DaPrato's lawsuit. Gilman obtained the lien on the date DaPrato's MRI was performed—the same date that Sacramento MRI assigned DaPrato's account to Gilman in exchange for his payment of DaPrato's medical bill. Because the events occurred on the same day, it is reasonable to infer that Gilman paid for DaPrato's medical treatment in exchange for a lien on his potential recovery in the pending litigation because (1) Sacramento MRI would not treat him if he was uninsured and unable to pay for treatment at the time that it was rendered, and (2) DaPrato could not afford medical treatment without Gilman's assistance.

The medical lien assigned to Gilman states in pertinent part: "With respect to any and all monies received as a result of this INCIDENT, you are not to disburse any such monies prior to paying LIEN MEDICAL in full for the lien that LIEN MEDICAL holds as a result of this INCIDENT." It is not an agreement to forgo payment if the litigation is unsuccessful; it is an agreement to wait for payment and to seek recovery from the litigation proceeds first before seeking payment from DaPrato, who remains liable for the entire amount of the bill. Thus, Gilman's lien was a sufficient property interest in the settlement to support an action for conversion. (See *Messerall v. Fulwider* (1988) 199 Cal.App.3d 1324, 1329–1331 [245 Cal.Rptr. 548]; *Hartford Financial Corp. v. Burns* (1979) 96 Cal.App.3d 591, 605 [158 Cal.Rptr. 169].)

The second ground upon which the trial court relied—there was nothing for defendants to convert because the entire settlement was expended on litigation costs—raises a mixed question of law and fact.

We turn first to the question of law, namely, whether an attorney lien for the costs of litigation,[2] like one claimed by defendants, takes priority over a medical lien,[3] like Gilman has, against the proceeds of the settlement, regardless of which was first in time.

---

[2] "In California, a lien in favor of an attorney upon the proceeds of a prospective judgment may either be created by express contract or implied from a retainer agreement that indicates the attorney is to look to the judgment for payment of his [or her] fee" and costs of the lawsuit. (*Waltrip v. Kimberlin, supra*, 164 Cal.App.4th at p. 525.) "Unlike a judgment creditor's lien, which is created when the notice of lien is filed [citation], an attorney's lien is a 'secret' lien; it is created and the attorney's security interest is protected even without a notice of lien." (*Carroll v. Interstate Brands Corp., supra*, 99 Cal.App.4th at p. 1172.)

[3] A contractual lien for the payment of medical services, like an attorney lien for fees and costs, does not need to be perfected by filing notice in the case in the same manner required of a judgment creditor. (*Nicoletti v. Lizzoli, supra*, 124 Cal.App.3d at p. 369 [medical providers with contractual liens on proceeds from a personal injury action are not judgment creditors; thus, rules applicable to judgment creditors regarding perfecting their liens do not apply].)

■ We begin by observing that, all things being equal, liens have priority among themselves according to the date of their creation. (Civ. Code, § 2897.) The record discloses that DaPrato signed Gilman's lien on May 4, 2001, and DaPrato's former attorney signed the lien three days later. DaPrato retained defendants on July 30, 2001, which presumably is the earliest date to create the attorney lien purportedly held by defendants. (*Carroll v. Interstate Brands Corp., supra,* 99 Cal.App.4th at p. 1175 [an attorney lien is created and becomes effective when executed].) While Gilman's lien would be second in time to any attorney lien held by DaPrato's former attorney, Gilman's lien existed before the effective date of defendants' purported attorney lien that was created later when they were retained by DaPrato. Thus, Gilman's lien would be superior to defendants' lien *if all "[o]ther things [are] equal."* (Civ. Code, § 2897, italics added; see *Del Conte Masonry Co. v. Lewis* (1971) 16 Cal.App.3d 678, 681 [94 Cal.Rptr. 439] [when determining the priority of liens, the time of creation is the last element for consideration and a lien can take priority, by reason of predating another lien, only if the two interests are in all other respects equal].)

This raises the question whether a medical lien and an attorney lien for fees and costs of litigation are equal with respect to the proceeds of a lawsuit brought on behalf of an injured person to recover damages from one who caused the injury.

■ "Interests are equal in equity when each is entitled to the same recognition and protection by reason of possessing to an equal degree those elements of right and justice which are recognized and aided by courts of equity." (*Nicoletti v. Lizzoli, supra,* 124 Cal.App.3d at p. 369.)

■ In general, equity and public policy favor giving medical liens and contractual attorney liens priority against a recovery obtained by the plaintiff. (*Pangborn Plumbing Corp. v. Carruthers & Skiffington, supra,* 97 Cal.App.4th at pp. 1049–1052 (hereafter *Pangborn*); *Wujcik v. Wujcik, supra,* 21 Cal.App.4th 1790, 1794 [there is a "strong public policy favoring the satisfaction of liens of medical providers and attorneys from personal injury recoveries"].)

Medical liens generally have priority for two reasons. First, "the medical lienors' labor, skills and materials [are] inextricably tied to the creation of the personal injury settlement proceeds; the final value of that settlement reflect[s] the value added by the medical providers' labor, goods and services." (*Pangborn, supra,* 97 Cal.App.4th at p. 1054.) Indeed, in a personal injury action, medical reports and bills from health care providers are typically essential to establish the extent of the plaintiff's injuries and damages. Thus, the medical providers' efforts in treating the injured plaintiff directly contribute to the success of the litigation. Second, "in personal injury cases the

injured party's need for medical attention may be immediate while the ability to pay for that attention before it is provided may be absent. If medical providers did not have at least the security of priority against a subsequent recovery, it would not be long before they ceased to perform their services until they were paid." (*Wujcik v. Wujcik, supra*, 21 Cal.App.4th at p. 1795; see also *Nicoletti v. Lizzoli, supra*, 124 Cal.App.3d at pp. 369–370.)

Similar considerations favor the priority of an attorney lien against a judgment recovered by the attorney's client. (*Waltrip v. Kimberlin, supra*, 164 Cal.App.4th at p. 525 ["Public policy favors the priority of [such an] attorney lien."].) First, "[i]t is the attorney's labor, skill and materials, and his [or her] willingness to take the risk of no recovery, that results in the judgment or settlement paid to the debtor. [Citation.] ' "The special or charging lien of an attorney has been held to be an equitable right to have the fees and costs due to [the attorney] for services in a suit secured to him [or her] out of the judgment or recovery in the particular action, the attorney to the extent of such services being regarded as an equitable assignee of the judgment. It is based . . . on the natural equity that a party should not be allowed to appropriate the whole of a judgment in his favor without paying for the services of his attorney in obtaining such judgment." ' [Citation.]" (*Id.* at p. 526.) Second, "[i]f an attorney's claim for a lien on the judgment based on a contract for fees earned prior to and in the action cannot prevail over the lien of a subsequent judgment creditor, persons with meritorious claims might well be deprived of legal representation because of their inability to pay legal fees or to assure that such fees will be paid out of the sum recovered in the latest lawsuit." (*Cetenko v. United California Bank, supra*, 30 Cal.3d at pp. 535–536.)

■    Despite the similarity of equities favoring the priority of medical liens and attorney liens, we conclude that, as a matter of public policy, a medical lien against the recovery in a personal injury lawsuit is not equal in equity to an attorney lien for fees and costs created by a retainer agreement to litigate the lawsuit.

As a practical matter, medical liens have value only if the treated patient obtains a judgment from which the liens can be paid. Although the patient is personally liable for the cost of services, a collection action against a patient with limited resources is economically unfeasible. Thus, unless the patient gets a monetary recovery in a lawsuit, the medical liens will usually remain unpaid, and the provider will never obtain payment for the services rendered.

Also, as a practical matter, the patient's chances of success in obtaining a judgment that adequately compensates the person for his or her damages, including the cost of the medical services, are greatly diminished if the person is not represented by a lawyer. It follows that the medical provider's chances of obtaining payment via a medical lien are greatly reduced if the patient lacks legal representation while prosecuting a lawsuit against a tortfeasor.

And, as a practical matter, it is a rare personal injury plaintiff who has the assets to pay for legal representation on an hourly basis plus costs, and also has the willingness to assume the financial risk of not prevailing in the lawsuit. For this reason, almost all plaintiff retainer agreements in personal injury actions are on a contingency fee basis, with the lawyer's fees and costs to be paid from a judgment in favor of the client, and the lawyer receiving nothing if the client loses the lawsuit.

An attorney lien that includes fees and the costs of suit is a necessary incentive for personal injury plaintiffs' lawyers to represent such clients. In many cases today, the costs of litigation can reach tens of thousands of dollars, far beyond the out-of-pocket resources of most plaintiffs in our society. Therefore, few, if any, personal injury plaintiffs' lawyers would be willing to represent a client on a contingency fee basis if an attorney lien for fees and costs does not have priority over medical liens.

By adding to the incentive for a lawyer to represent an injured patient in a lawsuit against an alleged tortfeasor, an attorney lien for fees and costs works to the benefit of other creditors, such as medical lienholders, because, without the lawyer's services, there may be no judgment from which the lienholders can recover on their claims, and the injured party may otherwise have no funds to cover the liens.

In sum, an attorney lien for fees and costs is essential (1) to ensure that injured persons can obtain legal representation in lawsuits to obtain adequate compensation for the injuries they have suffered, (2) to hold tortfeasors accountable for the harm they have caused, and (3) to provide medical lienholders with a source for compensation that they otherwise might not have. Thus, public policy and equity favor giving an attorney lien for fees and costs priority over a medical lien, regardless of which lien was first in time.

Accordingly, as a matter of law, the amount recovered by the plaintiff in a personal injury lawsuit always goes first to satisfy the attorney lien for fees and costs before it is used to satisfy medical liens. If, as in this case, the payment of the attorney lien for costs completely depletes the amount of the judgment, there is nothing left to support a medical lienholder's action for conversion of the proceeds of the judgment.

This brings us to the question of fact in this case—whether defendants had an attorney lien for the costs of litigation.

In moving for summary judgment, it was defendants' burden to establish "by declarations and evidence" this dispositive fact necessary for a complete defense to a cause of action for conversion. (See *Rosenblum v. Safeco Ins. Co.* (2005) 126 Cal.App.4th 847, 856 [24 Cal.Rptr.3d 427]; Code Civ. Proc., § 437c, subd. (f)(1).) However, although their answer alleged the existence of other, unspecified liens superior to Gilman's lien, defendants did not present any proof that they had an attorney lien for fees and costs against DaPrato's recovery. Indeed, while their motion for summary judgment and their separate statement of undisputed facts referred to the costs they had incurred in the DaPrato litigation, they made no mention of their having an attorney lien for fees and costs.

Because defendants presented no evidence that they had an attorney lien entitling them to deduct their litigation costs from the settlement recovery, we must reverse the summary judgment entered in their favor on the conversion cause of action.

### III

The trial court awarded to defendants the sum of $17,229.27 in attorney fees and costs pursuant to Civil Code section 1717, predicated on its finding that defendants were the prevailing parties in Gilman's action based upon the lien agreement that contains an attorney fee provision.

In light of our conclusion that the judgment must be reversed as to the conversion cause of action, it no longer can be said that defendants are the prevailing parties. Accordingly, we must reverse the award of fees and costs, and thus need not address Gilman's contention that the award was erroneous because defendants were represented by a member of their law firm, the equivalent of self-representation. (See *Trope v. Katz* (1995) 11 Cal.4th 274, 280, 292 [45 Cal.Rptr.2d 241, 902 P.2d 259] ["an attorney who chooses to litigate in propria persona and therefore does not pay or become liable to pay consideration in exchange for legal representation cannot recover 'reasonable attorney's fees' under [Civil Code] section 1717 . . ."]; see *Witte v. Kaufman* (2006) 141 Cal.App.4th 1201, 1211 [46 Cal.Rptr.3d 845].)

## DISPOSITION

The judgment and the award of attorney fees and costs are reversed, and the matter is remanded to the trial court for further proceedings, consistent with this decision, on the conversion cause of action. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

Raye, J., and Robie, J., concurred.